## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, and [UNDER SEAL], | ) ) ) | No. 4:17-CV-169 |
| Plaintiffs, | ) ) | |
| v. | ) ) | FILED <u>IN CAMERA</u> AND <u>UNDER SEAL</u> |
| [UNDER SEAL] | ) ) | |
| Defendants. | ) ) | JURY TRIAL DEMAND |

<u>COMPLAINT</u>

# UNDER SEAL

| | |
|---|---|
| Gaylon C. Hayes<br>Okla Bar 14492; Tx Bar 24071384<br>Hayes Legal Group, P.C.<br>6805 S. Western, Suite 500<br>Oklahoma City, OK 73139<br>Telephone: (405) 616-5045<br>Fax: (405) 616-5062<br>E-Mail: gaylon@ hhhlawfirm.com;<br>brook2@hhhlawfirm.com | Wayne Allison, Ok Bar 21933<br>Allison Legal, PLLC<br>5701 Highland Arbors Dr.<br>Edmond, OK 73034<br>405-888-6933; Fax 866-266-2781<br>E-mail: wayne@allisonlegal.com |

*ATTORNEYS FOR PLAINTIFFS*

**Table of Contents**

I.    INTRODUCTION.................................................................................................3

II.   JURISDICTION AND VENUE ...........................................................................4

III.  PARTIES ..............................................................................................................5

    A.    Defendants...................................................................................................5
    B.    Relator .........................................................................................................6

IV.  LEGAL FRAMEWORK......................................................................................6

    A.    Health Care Programs .................................................................................6
    B.    Federal False Claims Act ............................................................................8
    C.    Anti-Kickback Statute .................................................................................8
    D.    Government Health Plans Prescription Medication Reimbursement..........11

V.   FACTUAL ALLEGATIONS...............................................................................11

    A.    Blanket Program........................................................................................11
    B.    Sugar Program...........................................................................................13
    C.    Medical Necessity for Compounded Medications .....................................14
    D.    Waiver of Coinsurance and Copays ...........................................................15
    E.    Gray Market Prescriptions.........................................................................16

VI.  CLAIMS ..............................................................................................................17

    COUNT 1: False Claims Submitted Under 31 U.S.C. § 3729(a)(1)(A) ...........17
    COUNT 2: False Records Under 31 U.S.C. § 3729(a)(1)(B) .........................18
    COUNT 3: Conspiracy Under 31 U.S.C. § 3729(a)(1)(C) .............................19
    COUNT 4: False Certification Under 31 U.S.C. § 3729(a)(1)(G)..................19
    COUNT 5: Retention Of Overpayments Under 31 U.S.C. § 3729(a)(1)(G) ................20
    COUNT 6: Violation of the Anti-Kickback Statute 42 U.S.C. § 1320a-7b(b)..............21

VII. REQUEST FOR TRIAL BY JURY.....................................................................22

| | | |
|---|---|---|
| **1) THE UNITED STATES OF AMERICA, and**<br>**2) TOM PROCTOR,**<br><br>     **Plaintiffs,**<br><br>**v.**<br><br>**1) NEXT HEALTH, LLC,**<br>**2) SEMYON NAROSOV, and**<br>**3) ANDREW HILLMAN**<br><br>     **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **No.** *4:17-CV-169*<br><br><br>**FILED <u>IN CAMERA</u> AND <u>UNDER SEAL</u>**<br><br><br>**JURY TRIAL DEMAND** |

## COMPLAINT

**COMES NOW**, Tom Proctor ("**Relator**"), and files this Complaint on behalf of the United States of America ("**USA**") and the States of Oklahoma, Arizona, Louisiana, and Texas (collectively referenced as "**States**" or "**Plaintiff States**")(USA and the States referenced as "**Government**") against Next Health LLC, Semyon Narosov, and Andrew Hillman (collectively, "**Defendants**"), and alleges the following:

2

# I.    INTRODUCTION

1.    This action and Relator's claims arise pursuant to the Federal False Claims Act ("**FCA**"), 31 USC § 3729 *et seq.*, and various Plaintiff State false claims and health care fraud remedial statutes ("**Plaintiff State false claim statutes**").  The pertinent Plaintiff State false claim statutes include Oklahoma (63 O.S. 5053 *et seq.*), Texas (§§ 36.001 *et seq.*, 32.039 *et seq.*), Arizona (no FCA-analogous statute), New Mexico (§ 27-14-1 *et seq.*), Louisiana (Title 46, § 437.1 *et seq.*), and Florida (Title 6, § 68.081 *et seq.*)(collectively, "**FCA Acts**").  The FCA and each of the FCA Acts authorize private persons to bring a civil action for the person and the applicable governmental entity against a person who commits one or more acts in violation of the particular false claims statute.  Remedies include the recovery of a civil penalty for each false claim violation and a multiple of damages based on a single damages multiplier (e.g., treble damages under the FCA).  As an award, the Relator is entitled to receive a percentage of the proceeds of the action or settlement of the claim(s) and an award against the Defendant(s) for reasonable expenses, plus attorneys' fees and costs.

2.    Defendants' unlawful acts in violation of the FCA and the FCA Acts concern Defendants' submission of false claims to Federal and State health care programs related to Defendants' schemes employed for the ordering and prescription of drugs furnished to program beneficiaries, and Defendants' use of materially false records and statements in support of those false claims.

3.  Relator's claims include damages concerning FCA violations relating to Medicaid programs in each State where Next Health had/has operations. Because each State Medicaid program is jointly funded by the USA and the particular State, each FCA false claim violation by Defendants against a State Medicaid program is a false claim against the State's FCA Act and also the USA for the federal share of the false claim amount.

## II.  <u>JURISDICTION AND VENUE</u>

4.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3730(b). This court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a). This court also has supplemental jurisdiction over the State law claims under 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367.

5.  Venue in this Judicial District is appropriate under 31 U.S.C. § 3732(a) because one or more of the Defendants transact or have transacted business in this Judicial District.

6.  Relator believes there has been no public disclosure of the allegations and transactions on which this action is based; but should the question arise, and should the court determine otherwise, the Relator is an original source of the information on which the allegations in this complaint are based, as defined in FCA § 3730(e)(4)(B). As a member of the pharmacy profession and former Next health

pharmacist compliance officer, Relator has knowledge and information which is not publicly available.

## III. PARTIES

**A.** **Defendants**

7. Defendant, Next Health, LLC ("**Next Health**") is a limited liability company organized under the laws of Texas, with its principal place of business in Texas. It's address is 5710 LBJ Freeway, Suite 300, Dallas, TX 75240, with registered agent being Oberheiden Law Group, PLLC at 5710 LBJ Freeway, Suite 120, Dallas, TX 75240. Next Health is the parent company to myriad subsidiaries which are mere business conduits, and it does not observe corporate formalities between and among them. Next Health owns a chain of approximately 144 drugstores and pharmacies located in a number of States including Oklahoma, Texas, Louisiana, Arizona, and Florida.

8. Defendant Semyon Narosov ("**Narosov**") is an owner, operator, manager and/or director of Next Health and is involved in Next Health's day to day operations. He is also an architect of the Defendant's "**Blanket Program**" fraud scheme and the "**Sugar Program**," described, *infra*. Narosov is a beneficiary of these two and other fraudulent schemes.

9. Defendant Andrew Hillman ("**Hillman**") is an owner, operator, manager and/or director of Next Health and is involved in Next Health's day to day operations. He is also an architect of the Defendant's "**Blanket Program**" fraud scheme and the

5

"**Sugar Program**," described, *infra*. Hillman is a beneficiary of these two schemes and other fraudulent schemes.

**B.**      **Relator**

10.      Relator Tom Proctor ("**Relator**") is a citizen of the United States and a resident of the State of Texas. Relator holds a Doctor of Pharmacy degree from Southwestern State University of Oklahoma and is a licensed pharmacist in the State of Texas and several other States. Currently, Relator works as a pharmacist in the State of Texas as a Corporate Compliance Officer. Relator formerly worked for the Defendant Next Care as a compliance officer.

## IV.      LEGAL FRAMEWORK

**A.**      **Health Care Programs**

11.      In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain health care services and items. 42 U.S.C. §§ 1395 et seq. Health and Human Services ("**HHS**") is responsible for the administration and supervision of the Medicare program. Centers for Medicare and Medicaid Services ("**CMS**") is an agency of HHS and directly administers the Medicare program. The Medicare program has several parts, including Medicare Part A, B, and D, each providing health care coverage for various forms of goods and services such as hospitalization, physician services, and prescription medications. 42 U.S.C. § 1395k; 42 C.F.R. § 410.10.

12.     TRICARE, formerly known as CHAMPUS, is a federal health benefits program established by 10 U.S.C. §§ 1071-1110, is administered by the U.S. Secretary of Defense and provides health care benefits to eligible beneficiaries, which include, among others, active duty service members, retired service members, and their dependents.

13.     Medicaid is a joint Federal-State program providing health coverage to certain qualifying individuals.  42 U.S.C. § 1396-1. Congress and CMS set out general rules under which Medicaid operates. Each State runs its own Medicaid program. Medicaid is partially funded by Federal funds and partially funded by State funds.  42 U.S.C. § 1396(a).  Eligibility for Medicaid is largely determined by income.  Each State must operate its own Medicaid system, but that system must conform to Federal guidelines in order for the State to receive matching funds and grants.

14.     The Federal Employees Health Benefits Program ("**FEHBP**") offers comprehensive group health insurance to federal employees, retirees and their eligible family members through a wide variety of qualified carriers and plans approved by the U.S. Office of Personnel Management ("**OPM**").  The FEHBP is funded in part with Federal funds.

15.     All Federal and State funded health benefits programs (including, *inter alia*, Medicare, Medicaid, TRICARE, and FEHBP)(hereafter, "**Government Health Plans**" or "**GHPs**") require as a material condition of payment that authorized medical providers comply with various statutory and regulatory requirements including, *inter alia*, those requiring face-to-face patient encounters; medical practice activities within a prescribed

7

licensure and credentialing and scope of practice; the Anti-Kickback Statute; and Federal and State certifications.

**B.      Federal False Claims Act**

16.      The Federal False Claims Act (31 U.S.C. § 3729 *et seq.*, "**FCA**") provides, in pertinent part, that:

> (a)(1) [a]ny person who (A) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); (D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property ... or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government ...

> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus 3 times the amount of damages which the Government sustains because of the act of that person.

* * *

> (b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

**C.      Anti-Kickback Statute**

17.      The Anti-Kickback Statute ("**AKS**"), 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that remuneration provided to those who can influence health care

decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or harmful to a vulnerable patient population. To protect the integrity of Federal health care programs from these harms, Congress enacted a prohibition against the payment of kickbacks in any form. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142: Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

18.     The AKS prohibits any person or entity from soliciting, receiving, offering, or paying remuneration, in cash or in kind, directly or indirectly, to induce or reward any person for purchasing, ordering, or recommending or arranging for the purchasing or ordering of federally funded medical goods or services:

> [W]hoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind--
>
> (A)     in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B)     in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both. 42 U.S.C. § 1320a-7b(b).

19.     Violation of the AKS also subjects the perpetrator to potential exclusion from participation in GHPs and, "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of" the FCA. 42 U.S.C. § 1320a-7b(g).

20.     The AKS and the corresponding regulations establish a number of exceptions ("**Safe Harbors**") for common business arrangements. 42 C.F.R. § 1001.952. These Safe Harbors protect arrangements from creating liability under the statute. An arrangement must be squarely in a Safe Harbor to be protected. Safe Harbor protection requires strict compliance with all applicable conditions set out in the relevant regulation. Once the plaintiff proves that the AKS applies, the burden shifts to the defendant to prove that the conduct strictly satisfies one of the exceptions. Relator alleges that no Safe Harbor applies to the conduct alleged herein as violating the AKS.

21.     Violation of the AKS renders all claims for payment resulting from the unlawful referrals, submitted or caused to be submitted by parties involved to GHPs, to be subject to the FCA.

22.     Falsely certifying compliance with the AKS is a material consideration of GHPs for making payment.

**D.    Government Health Plans Prescription Medication Reimbursement**

23.    GHPs implement various reimbursement methodologies for prescription medications provided to GHP beneficiaries.

24.    The varying reimbursement methodologies employed by GHPs include strict compliant pricing requirements using various schemes known as and including: Medicare Part D; Usual and Customary pricing; Maximum Allowable Cost; Federal Upper Limit; Estimated Acquisition Cost; Contracted Pricing; Negotiated Pricing; and Average Wholesale Price.

25.    Each of the GHP reimbursement methodologies are intended to consistently obtain the prescription dispensary's best pricing for GHP beneficiaries and the Government.

26.    GHP reimbursement methodologies require the prescribing medical provider hold proper certification and licensure, and issue prescriptions based on an established relationship with the patient and the patient's documented medical necessity, and to be within the medical provider's prescribed scope of practice limitations.

## V.    FACTUAL ALLEGATIONS

**A.    Blanket Program**

27.    Next Health's Blanket Program ("**Blanket Program**") was used by different pharmacies owned or controlled by Next Health to solicit prescriptions from a network of medical providers in violation of, *inter alia*, the AKS.

28.     The Blanket Program utilized a **"Blanket Agreement"** executed by medical providers who regularly prescribe medications to GHP beneficiaries.

29.     The Blanket Agreements provided for medical providers' pre-authorization to substitute one or more prescription and non-prescription medications for the providers' prescribed medication.

30.     Next Health employed and/or contracted with individuals known as **"Medical Representatives"** or **"Sponsors"** (hereafter, **"Sponsor"**) and sales representatives to solicit medical providers to join the Blanket Program.

31.     Next Health substituted medications based on GHP and non-GHP reimbursement; not on medical necessity, and without consideration of or adherence to Federal or State regulations prohibiting such substitutions.

32.     Next Health unlawfully paid money to the Blanket Program medical providers in amounts based on the medical providers' volume and value of prescriptions filled through Next Health controlled pharmacies.

33.     To grow its network of medical providers prescribing medications to be filled at Next Health pharmacies under the Blanket Program, Next Health encouraged medical providers to utilize and pre-authorize other medical providers (Sub-Level Providers). Next Health kept a running tally of the amount of prescriptions sent by Sub-Level Providers so the Sub-Level Providers' authorizing provider would get "credit" for those prescriptions, and thereby increase the amount of remuneration Next Health paid to the authorizing provider.

34.     The Sub-Level Providers were encouraged to and routinely did prescribe medications through Next Health pharmacies, often without their authorizing-provider having seen the patient for whom prescriptions were being ordered.

35.     The Sub-Level Providers were often not properly qualified, credentialed, or appropriately licensed to order certain medications for patients, but did so unlawfully under the Blanket Program providers' licensure and authority.

36.     Each Sub-Level Provider's prescription would accrue financial benefit to the Blanket Program medical provider.

37.     Next Health would bill to and collect from GHP and non-GHP payors for all Blanket Program prescriptions, and in turn distribute the collected amounts as follows: 30% to the Blanket Program medical provider; 5-10% to the Sponsor; 10% to the sales representative; and 50-55% to Next Health.

**B.     Sugar Program**

38.     Next Health developed a large, expansive, and extensive network of Blanket Program prescribing medical providers, primarily across Texas, Oklahoma, Louisiana, Arizona, New Mexico, and Florida.

39.     Next Health maintained a separate accounting system for keeping up with and managing its network of prescribing medical providers.  This separate system was referred to internally within Next Health as the "**Sugar Program**."

40. Next Health maintained exceptionally tight controls on who was allowed access to the Sugar Program, which did not include Relator but did include Defendants Narosov and Hillman.

41. Next Health management, including Narosov and Hillman, created and maintained the Sugar Program because they knew their Blanket Program activities violated Federal and State law, including the AKS.

42. The Sugar Program was not used to manage the day-to-day operations associated with handling over 100 pharmacies, thousands of prescriptions, and hundreds of prescribing medical providers; Next Health employed another system for these tasks ("**Operational Program**").

43. To maintain its Blanket Program scheme, the data within the Operational Program and the Sugar Program necessarily required some synchronization for data elements such as the list of prescribing medical providers, Sponsors and sales representatives.

## C. Medical Necessity for Compounded Medications

44. Next Health created, distributed and used a variety of paper forms for its Blanket Program, including forms for pre-determined compounded medication prescriptions.

45. Next Health provided these forms to its expansive list of prescribing medical providers so these providers could easily select and prescribe one or more compounded medications.

46.     A prescribing medical provider would transmit a completed form to Next Health, often by fax, and Next Health would then determine which of its pharmacies would fill the prescription and at what price. Delivery of the medication to the patient was often done by use of overnight courier.

47.     Often, the medical provider ordering the medication was a Sub-Level Provider, and would be ordering a prescription outside of the limits and scope of their medical licensure. Next Health would not fill the prescription under the authorization of the medical provider that actually ordered it (i.e., the Sub-Level Providers); rather, Next Health had set up its Operational and Sugar Programs to substitute another medical provider who, often, had not even seen the patient.

**D.     Waiver of Coinsurance and Copays**

48.     Next Health would routinely waive or significantly reduce GHP beneficiaries' coinsurance and/or copay amounts due.

49.     Even though waiving these amounts meant less revenue to Next Health for any particular transaction, Next Health was motivated to waive these amounts so the patient would not reject the prescription fulfillment because of a high coinsurance and/or copay amount.

50.     By so doing, Next Health could bill a GHP for amounts often in the thousands of dollars for a single prescription, with the patient unaware that, pursuant to their GHP, they were supposed to have paid hundreds of dollars.

51.    Next Health would routinely charge different amounts to different patients, including GHP beneficiaries, in violation of the various pricing regulations imposed by GHPs on pharmacies.

**E.    Gray Market Prescriptions**

52.    Next Health routinely employed and/or contracted with individuals and/or organizations for the purpose of importing prescription medications not approved by the U.S. Food and Drug Administration ("**FDA**"), and then distributing these "counterfeit" medications through Next Health's network of pharmacies.  Individuals Relator knows were involved include Mr. Allen Cohen and Mr. Noah Jessup.

53.    These counterfeit medications were often sourced from China without pedigreed and documented quality control, ingredient lists, inspection, or other requisite requirements for medication distribution pursuant to statute and rules of the FDA and other Government Agencies.

54.    The Gray Market scheme utilized a packaging and coding scheme to give the counterfeit medications a legitimate appearance, however often using National Drug Control ("**NDC**") numbers that were unassigned.

55.    Next Health manages over 100 pharmacies it has built, acquired, and partnered with.  Next Health routinely distributes (i.e., launders) the counterfeit medications through its pharmacies that it has acquired by stocking a recently acquired pharmacy(s) with these medications, and then managing other pharmacies' prescription

16

fulfillment centrally, having one pharmacy fill prescriptions for many others located elsewhere across the country.

56.     Relator believes that, at the time of filing this Complaint, there are currently thousands of such medications being sold through Next Health pharmacies, utilizing subsidiaries, d/b/a's, tradenames, and/or affiliates including those referred to as "Med Creations," "Medical Direct," and "Altus."

57.     Relator has seen Next Health reports indicating that the Next Health pharmacy operations were producing approximately $35 million monthly revenue.

## VI.    CLAIMS

### COUNT 1: False Claims Submitted Under 31 U.S.C. § 3729(a)(1)(A)

58.     The FCA provides liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).

59.     As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendants have knowingly presented or caused to be presented false or fraudulent claims to Federal and State healthcare programs for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

60.     The United States Government, or its authorized agent, unaware of the improper supervision orchestrated by Defendants, paid the false and/or fraudulent claims. A violation of § 3729(a)(1)(A) is material to the Government's decision to make payment.

61. By virtue of the false or fraudulent claims Defendants knowingly caused to be presented, the United States Government has suffered substantial monetary damages.

## COUNT 2: False Records Under 31 U.S.C. § 3729(a)(1)(B)

62. The FCA provides liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

63. As particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendants have knowingly made, used, or caused to be made or used, false records or statements – i.e., the false records, certifications and representations made or caused to be made by Defendants – material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

64. Defendants knowingly made or used false records or statements (a) to get false or fraudulent claims paid or approved by the Government, and/or (b) material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a). The false records or statements included, but were not limited to, the Defendants' false certifications and representations of full compliance with all Federal and State laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to violation of the AKS.

65. A violation of § 3729(a)(1)(B) is material to the Government's decision to make payment.

66. By virtue of the false records or statements made or used by Defendants, the United States Government has suffered substantial monetary damages.

## COUNT 3: Conspiracy Under 31 U.S.C. § 3729(a)(1)(C)

67. The FCA provides liability for any person who "conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)." 31 U.S.C. § 3729(a)(1)(C).

68. Two or more of Defendants and/or Next Health management entered into agreements among each other and overtly acted to conspire to defraud the United States by submitting false or fraudulent claims for reimbursement from the United States for money to which they were not entitled, in violation of 31 U.S.C. § 3729(a)(1)(C). As part of the schemes and agreements to obtain reimbursement from the United States in violation of Federal laws, Defendants overtly acted to conspire to create the Blanket Program and use the Sugar Program to conceal it.

69. A violation of § 3729(a)(1)(C) is material to the Government's decision to make payment.

70. By virtue of the false records or statements made or used by Defendants, the United States Government has suffered substantial monetary damages.

## COUNT 4: False Certification Under 31 U.S.C. § 3729(a)(1)(G)

71. The FCA provides liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

72.     As particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendants have knowingly made, used, or caused to be made or used, false records or statements – i.e., the false records, certifications and representations made or caused to be made by Defendants – material to an obligation to pay or transmit money to the Government to knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

73.     Defendants knowingly made or used false records or statements (a) to get false or fraudulent claims paid or approved by the Government, and/or (b) material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a).

74.     By virtue of the false records or statements made or used by Defendants, the United States Government has suffered substantial monetary damages.

## COUNT 5: Retention Of Overpayments Under 31 U.S.C. § 3729(a)(1)(G)

75.     The FCA provides liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

76.     As particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendants have knowingly made, used, or caused to be made or used, false records or statements – i.e., the false certifications and representations made or caused to be made by Defendants – material to an obligation to pay or transmit money to the

Government to knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

77.    Defendants had knowledge of the various schemes employed as set forth in the forgoing paragraphs, and in violation of the FCA retained the payments they received from the Government.  Defendants' failure to return these payments within sixty days subjects all such payments to liability under and recovery from the FCA.

78.    By virtue of the false records or statements made or used by Defendants, the United States Government has suffered substantial monetary damages.

### COUNT 6: Violation of the Anti-Kickback Statute 42 U.S.C. § 1320a-7b(b)

79.    The AKS provides liability for any person or entity for soliciting, receiving, offering, or paying remuneration, in cash or in kind, directly or indirectly, to induce or reward any person for purchasing, ordering, or recommending or arranging for the purchasing or ordering of federally funded medical goods or services.  42 U.S.C. § 1320a-7b(b).

80.    The AKS provides that "a claim that includes items or services resulting from a violation of" the AKS is "a false or fraudulent claim for purposes" of the FCA, thereby invoking the FCA's damages and penalties provisions for each such claim. 42 U.S.C. § 1320a-7b(g).

81.    As particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendants have knowingly violated the AKS in their Blanket Program implementation, and attempted to conceal it by use of their Sugar Program.

82. By virtue of Defendant's actions, Defendants have knowingly violated the AKS and the FCA, and the United States Government has suffered substantial monetary damages as a result.

## VII.   REQUEST FOR TRIAL BY JURY

83. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Relator hereby demands trial by jury.

**WHEREFORE**, Relator, on behalf of himself and the United States, prays that the Court enter judgment against Defendants in an amount equal to the amount determined pursuant to the Federal False Claims Act and the Anti-Kickback Statute as damages the United States sustained, plus civil penalties for each and every violation as prescribed by statute; that the Relator be awarded an amount that the Court decides pursuant to the Federal False Claims Act and the Anti-Kickback Statute as reasonable for collecting such civil penalties and damages; and that the Relator be awarded all costs and expenses incurred, including reasonable attorney's fees; and other such relief the court deems appropriate.

*[The Remainder Of This Page Intentionally Left Blank]*

Respectfully submitted,

GAYLON C. HAYES
Okla Bar 14492; Tx Bar 24071384
6805 South Western Ave. Suite 500
Oklahoma City, OK 73139
Telephone: 405/616-5045
Facsimile: 405/616-5062
gaylon@hhhlawfirm.com
brooke@hhhlawfirm.com
*and*
WAYNE ALLISON
Okla Bar 21933
Allison Legal, PLLC
5701 Highland Arbors Dr.
Edmond, OK 73034
405/888-6933; c:405/250-2782; f:866/266-2781
wayne@allisonlegal.com
*Attorneys for Relator*